USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: SEP 20 2007

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA :

         - v. - :

CARLOS CUEVAS, :
JAMES YOON,
    a/k/a "Peter Kim," :
THOMAS BUTLER, and
SHAWN ARMSTRONG, :

               Defendants. :
- - - - - - - - - - - - - - - - - -X

**SEALED INDICTMENT**

07 Cr.

**07 CRIM. 892**

## COUNT ONE

(Anabolic Steroid Distribution Conspiracy)

The Grand Jury charges:

1.  From at least in or about 2006 up to and including in or about July 2007, in the Southern District of New York and elsewhere, CARLOS CUEVAS, JAMES YOON, a/k/a/ "Peter Kim," THOMAS BUTLER, and SHAWN ARMSTRONG, the defendants, and others known and unknown, unlawfully, intentionally and knowingly did combine, conspire, confederate and agree together and with each other to violate the narcotics laws of the United States.

2.  It was a part and an object of the conspiracy that CARLOS CUEVAS, JAMES YOON, a/k/a/ "Peter Kim," THOMAS BUTLER, and SHAWN ARMSTRONG, the defendants, and others known and unknown, would and did distribute, and possess with intent to distribute, controlled substances, to wit, anabolic steroids, a Schedule III controlled substance, without the written or oral prescription of a practitioner licensed by law to administer such drugs, in

violation of Title 21, United States Code, Sections 812, 829(b), 841(a)(1) and (b)(1)(D), and Title 21, Code of Federal Regulations, Sections 1306.21 and 1308.13.

### THE MEANS AND METHODS OF THE ANABOLIC STEROID DISTRIBUTION CONSPIRACY

**I.  ANABOLIC STEROID ABUSE AND THE ANABOLIC STEROIDS CONTROL ACT**

3. "Anabolic steroids" are more specifically referred to as anabolic-androgenic steroids (hereinafter referred to as "Steroids"), a term that describes a family of compounds that includes the male hormone testosterone and a large number of synthetic compounds structurally related to testosterone. The term "anabolic" refers to the positive effect the steroids have on muscle development, while "androgenic" refers to masculinizing effects produced by Steroids, such as the growth of body hair and deepening of the voice.

4. The anabolic and androgenic effects of Steroids have, in certain circumstances, legitimate medical and therapeutic uses. However, Steroids, even when legally prescribed and properly administered, can cause many adverse "side" effects, including, among other things, increased risk of cardiovascular disease resulting from high blood pressure and increased cholesterol levels. When Steroids are legitimately prescribed by a practitioner licensed to do so and properly administered, the risk of side effects can be monitored by a physician and counteracted by other drug and hormone therapies.

5.  Steroids are illegally abused primarily for their androgenic effects by non-athletes for cosmetic purposes, as well as to a lesser extent by athletes and bodybuilders for performance enhancement.  When Steroids are abused illegally without a prescription, whether for cosmetic or performance-enhancement purposes, they are almost always administered without medical supervision, and at dosage rates that greatly increase the risk of side effects.  Steroid use at improper dosage rates has also been linked to aggressive behavior (commonly referred to as "roid rage") and depression.

6.  Because of growing concern about Steroid abuse, particularly among high-school aged children, in 1990 Congress passed the Anabolic Steroids Control Act (the "Act"), which became effective on February 27, 1991.  The Act categorized Steroids as a Schedule III Controlled Substance and criminalized their unlawful distribution.  Pursuant to the Act, any company, corporation or individual intending to import or distribute a Schedule III Controlled Substance in the United States, such as anabolic steroids, must register with the United States Drug Enforcement Administration ("DEA") to do so.  The Act also provides that Steroids can only be dispensed, with limited exceptions, pursuant to a prescription from a licensed practitioner.

## II. THE ILLEGAL UNDERGROUND STEROID MARKET IN THE UNITED STATES

7. After the passage of the Act, and before 2005, the bulk of illegal Steroids distributed and used in the United States were manufactured in Mexico and smuggled into the United States as finished product, either in pill or injectible liquid form. While clandestine Steroid manufacturing labs ("Underground Labs" or "UGLs") existed in the United States and Canada during that time, the Underground Labs had limited customers due to the indeterminate quality and purity of their product and the superiority of Mexican-manufactured Steroids.

8. In December of 2005, a DEA investigation of the illegal importation of Mexican Steroids into the United States resulted in numerous arrests and indictments, and the dismantling of the eight largest Mexico-based illicit steroid manufacturing companies, reducing the United States illicit steroid supply by an estimated eighty percent. Thereafter, previously established and newly-created Underground Labs within the United States became the primary source of illicit Steroids purchased in the United States, and remain so today.

9. These domestic Underground Labs often purchase raw steroid powders from manufacturers in China in bulk over the Internet. The Chinese exporters frequently ship the raw materials to the UGLs using commercial shipping companies. Once received from China, the UGLs convert the raw powders into

4

finished product in the form of Steroid pills using a pill press, or, more commonly, into injectible Steroid solutions. The injectible Steroid solutions are made by combining the raw Steroid powders with commonly available oils and solvents, and mixing and heating them together using a simple heat source, often a hot plate. The necessary solvents and oils for this process can be purchased over the Internet from vendors who falsely label them as "aromatherapy" oils, and who also sell packages of other Steroid-related items such as syringes, glass bottles, bottle tops, filters, sealers, crimpers, and alcohol swabs, which are referred to as "conversion kits." The UGL manufacturing operations are crude and unsterile, and are often housed in basements, kitchens, and commercial storage units.

       10.  The UGLs advertise the availability for sale of their finished Steroid product almost exclusively on the Internet, primarily in secure chat rooms and discussion boards located on Internet websites ostensibly devoted to bodybuilding, many of which can be accessed only through invitation by a previously-admitted participant of the discussion community. The owners and principals of the UGLs, who are not physicians and are not licensed to prescribe, or registered to distribute, Steroids in the United States, typically post lists of available Steroid products, along with their prices, on the aforementioned bulletin boards.

11. The posted Underground Lab price lists are accompanied by instructions for contacting the UGL, primarily by electronic mail ("email"). The UGL owners and principals typically subscribe to email accounts provided by foreign-based, encrypted email service providers. Using encrypted e-mail communication facilitates avoiding law enforcement detection and the foreign location of the email servers places them beyond the reach of United States legal process.

12. Once the customer contacts the UGL and places an order to purchase Steroids, the UGL provides instructions regarding payment for its products, which are often designed to conceal the nature of the transaction and the identities of the participants. Typical payment methods include Western Union money transfers using aliases, mailing cash concealed in birthday and other greeting cards, and the purchase by the customer of a stored value debit card, access to which is granted by the customer to the UGL by transferring access codes and personal identification numbers to the UGL principals, who access the stored funds at bank automatic teller machines. When payment is received and processed, the UGLs send the Steroids to the customer using commercial mail shippers such as Federal Express and UPS, or using the Express Mail and Priority Mail services of the United States Postal Service. Customers purchasing illegal Steroids are located throughout the United States.

### III. THE SIUG LABS CRIMINAL ORGANIZATION'S ILLEGAL STEROID DISTRIBUTION ACTIVITIES

13.  At all times relevant to this Indictment, CARLOS CUEVAS, the defendant, owned and operated an illegal Steroid Underground Lab called "Strong Island Underground," often identified by the acronym "SIUG" (hereinafter "SIUG Labs"). In July of 2007, the SIUG Labs' Steroid distribution operation was based in a warehouse in Farmingdale, New York. The warehouse was rented by THOMAS BUTLER, the defendant, in his name, and was occupied by CUEVAS and BUTLER.

14.  CARLOS CUEVAS, the defendant, owned and operated the email address "ut_siug@hushmail.com" (the "SIUG Labs Email Address"). CUEVAS provided the SIUG Labs Email Address as the point of contact for SIUG Labs when advertising SIUG Labs Steroids for sale on various Internet websites and bulletin boards, and to receive Steroid purchase orders from, and to correspond with, the customers of SIUG Labs.

15.  In connection with the Steroid distribution conspiracy, CARLOS CUEVAS, the defendant, purchased raw Steroid powder over the Internet from sources in China, which was shipped to the United States using international commercial mail shipping companies. CUEVAS, who purchased as much as two kilograms of raw powder at a time, directed the raw Steroid powders to be shipped to SHAWN ARMSTRONG, the defendant, at the house of one of ARMSTRONG's relatives. Typically, ARMSTRONG then retrieved the

7

packages of raw Steroid powder and delivered them to JAMES YOON, a/k/a "Peter Kim," the defendant, who in turn delivered the raw powder to CUEVAS.

    16.  THOMAS BUTLER, the defendant, sold glassware and lab supplies to CARLOS CUEVAS, the defendant, specifically for the conversion of raw Steroid powder into injectable liquid Steroid solutions at the SIUG Labs location in Farmingdale, New York.  BUTLER maintained and operated his Lab supply business from the Farmingdale, New York location of the SIUG Labs Steroid organization.

    17.  JAMES YOON, a/k/a "Peter Kim," the defendant, worked for SIUG Labs and for CARLOS CUEVAS, the defendant. YOON's duties included: (1) retrieving finished and packaged SIUG Labs Steroid product from CUEVAS and mailing it to customers via commercial mail services to fulfill pending orders; (2) receiving supplies for the SIUG Labs steroid distribution operation, which were ordered by CUEVAS and directed by CUEVAS to be delivered to YOON, often using YOON's alias "Peter Kim," and (3) retrieving raw Steroid powder purchased by CUEVAS from Chinese sources and shipped to SHAWN ARMSTRONG, the defendant, at the direction of CUEVAS.

    18.  At all times relevant to this Indictment, neither CARLOS CUEVAS, JAMES YOON a/k/a "Peter Kim," THOMAS BUTLER nor SHAWN ARMSTRONG was a licensed practitioner authorized to

prescribe or administer Steroids, nor did SIUG Labs or any of the defendants register with DEA to distribute Steroids.

Overt Acts

19. In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

    a. In or about early March 2007, a confidential informant, acting under the supervision of law enforcement, sent an e-mail to CARLOS CUEVAS, the defendant, at the SIUG Labs Email Address ("ut_siug@hushmail.com") placing an order for injectable liquid Steroids. On or about March 6, 2007, CUEVAS sent a response email from the SIUG Labs Email Address providing instructions for payment for the requested Steroids by Western Union money transfer.

    b. On or about March 19, 2007, CUEVAS caused a package containing liquid vials of Steroids, including: (1) testosterone enanthate; (2) boldenone undecylenate; (3) testosterone propionate, and (4) nandrolone decanoate, to be sent to an undercover law enforcement mailbox in Harrison, New York.

    c. On or about April 25, 2007, JAMES YOON, a/k/a "Peter Kim," the defendant, delivered empty Federal Express shipping boxes to CUEVAS in East Meadow, New York.

    d. In or about June 2007, a law enforcement officer

acting in an undercover capacity sent an e-mail to CUEVAS at the SIUG Labs Email Address, placing an order to purchase Steroids. On or about July 19, 2007, CUEVAS caused a package containing liquid vials of the Steroids boldenone and testosterone, as well as pills of the Steroid winstrol, to be delivered to an undercover law enforcement mailbox in Manhattan, New York.

  e. On or about July 17, 2007, SHAWN ARMSTRONG, the defendant, received in Westbury, New York, a package shipped from China containing approximately two kilograms of raw Steroid powder. ARMSTRONG subsequently delivered the Steroid powder to YOON in Westbury, New York, for eventual delivery to CUEVAS.

  f. On or about July 23, 2007, in Farmingdale, New York, CARLOS CUEVAS and THOMAS BUTLER, the defendants, possessed glassware, laboratory equipment, "conversion kit" materials, and approximately 1.1 million dosage units of powder and liquid injectable Steroids and other ancillary drugs. Attached to this Indictment are three photographs taken of items possessed by CUEVAS and BUTLER on July 23, 2007, in Farmingdale, New York.

  (Title 21, United States Code, Section 846.)

## COUNT TWO

(Money Laundering Conspiracy)

The Grand Jury further charges:

20. From at least in or about 2006 up to and including

in or about July 2007, in the Southern District of New York and elsewhere, CARLOS CUEVAS and JAMES YOON, a/k/a/ "Peter Kim," the defendants, and others known and unknown, unlawfully, willfully and knowingly did combine, conspire, confederate and agree together and with each other to violate Section 1956(a)(1)(B)(i) of Title 18, United States Code.

    21. It was a part and an object of the conspiracy that CARLOS CUEVAS and JAMES YOON, a/k/a/ "Peter Kim," the defendants, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, knowing that the property involved in certain financial transactions, to wit, the transfers of thousands of dollars in cash, represented the proceeds of some form of unlawful activity, unlawfully, willfully and knowingly, would and did conduct and attempt to conduct such financial transactions which in fact involved the proceeds of specified unlawful activity, to wit, illegal trafficking in controlled substances, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

## THE MEANS AND METHODS OF THE MONEY LAUNDERING CONSPIRACY

22. CARLOS CUEVAS, the defendant, using the SIUG Labs Email Address, instructed the Steroid-purchasing customers of SIUG Labs to pay for Steroids purchased from SIUG Labs by transfering money to SIUG Labs using Western Union money transfers. According to directions provided by CUEVAS via email, customers were to initiate a Western Union money transfer to any one of eight nearby towns located in Long Island. The money transfers were to be sent to a name, and at a street address, fabricated by the customer. The customer was instructed by CUEVAS to specify to Western Union personnel that the payee of the funds transfer not be required to present identification to retrieve the funds, but rather that the payee be asked to provide the answer to a secret question provided to Western Union by the payor/Steroid purchaser. The customer was then instructed to send an email to CUEVAS at the SIUG Labs Email Address specifying the fabricated name and street address the customer had provided to Western Union, as well as the test question and answer that would permit CUEVAS, or one of his associates, to retrieve the funds without presenting identification.

23. JAMES YOON, a/k/a "Peter Kim," the defendant, at the direction of CARLOS CUEVAS, the defendant, and after being provided by CUEVAS with the relevant necessary information regarding incoming money transfers to SIUG Labs, retrieved SIUG Labs customer payments from Western Union locations by providing the fabricated name of the payee to Western Union employees and

by providing Western Union employees with the answer to the test question associated with the funds transfer. YOON then delivered the customer payments to CUEVAS.

### Overt Acts

24. In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

    a. On or about March 6, 2007, CARLOS CUEVAS, the defendant, using the SIUG Labs Email Address, sent an email to an undercover law enforcement officer in Manhattan. In the email, CUEVAS directed the undercover officer to pay for a Steroid purchase by Western Union money transfer to a fabricated name and street address and in such a way as to obviate the need for the payee to present identification when retrieving the funds from Western Union.

    b. On or about June 21, 2007, CUEVAS directed JAMES YOON, a/k/a "Peter Kim," the defendant, to retrieve funds from Western Union locations which had been transferred by customers of SIUG Labs in payment for Steroids purchased from SIUG Labs, and directed YOON to deliver the funds to CUEVAS.

(Title 18, United States Code, Section 1956(h).)

### FORFEITURE ALLEGATION AS TO COUNT ONE

25. As the result of committing the controlled substance offense alleged in Count One of this Indictment, CARLOS CUEVAS, JAMES YOON, a/k/a/ "Peter Kim," THOMAS BUTLER, and SHAWN

ARMSTRONG, the defendants, shall forfeit to the United States, pursuant to Title 21, United States Code, § 853, any and all property constituting or derived from any proceeds the defendants obtained directly or indirectly as a result of the said violation and any and all property used or intended to be used in any manner or part to commit and to facilitate the commission of the violation alleged in Count One of this Indictment, including, but not limited to, the following:

    a.    A sum of money in United States Currency representing the amount of proceeds obtained as a result of the offense alleged in Count One of this Indictment;

    b.    All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 254 Concord Avenue, East Meadow, New York, 11554; and

    c.    All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 409 Maple Avenue, Westbury, New York 11590.

<u>Substitute Asset Provision</u>

26.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

    (a)    cannot be located upon the exercise of due diligence;

    (b)    has been transferred or sold to, or deposited with, a third person;

      (c)    has been placed beyond the jurisdiction of the Court;

      (d)    has been substantially diminished in value; or

      (e)    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 United StatesC. § 853(p), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property. (Title 21, United States Code, Sections 841(a)(1), 846 and 853.)

### **FORFEITURE ALLEGATION AS TO COUNT TWO**

    27.    As the result of committing the money laundering offense alleged in Count Two of this Indictment, CARLOS CUEVAS and JAMES YOON, a/k/a "Peter Kim," the defendants, shall forfeit to the United States pursuant to Title 18, United States Code, § 982, all property, real and personal, involved in the money laundering offense and all property traceable to such property, including but not limited to the following:

    a.    A sum of money in United States currency, in that such sum in aggregate is property which was involved in the money laundering offense or is traceable to such property;

    b.    All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 254 Concord Avenue, East Meadow, New York, 11554; and

    c.    All that lot or parcel of land, together with its

buildings, appurtenances, improvements, fixtures, attachments and easements, located at 409 Maple Avenue, Westbury, New York 11590.

### Substitute Asset Provision

28. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which

cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, § 982(b), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 982 and 1956.)

_____
FOREPERSON

_____
MICHAEL J. GARCIA
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

---

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA**

**- v. -**

**CARLOS CUEVAS, JAMES YOON, a/k/a "Peter Kim," THOMAS BUTLER, and SHAWN ARMSTRONG,
Defendants.**

---

**INDICTMENT**

07 Cr.

(Title 21 United States Code, Section 846, and Title 18, United States Code, Section 1956(h).)

MICHAEL J. GARCIA
United States Attorney.

**A TRUE BILL**

_____
Foreperson.

---